R. I. RIGLER, Appellant, v. H. E. REID et al., Respondents.

St. Louis Court of Appeals, December 8, 1914.

1. **SALES: Fraud and Deceit: Rescission.** One who is defrauded in making a purchase has an election to either affirm or rescind the transaction, but an election to affirm will thereafter prevent a rescission.

2. **FRAUD AND DECEIT: Sales: Rescission: Evidence.** Where a person made two separate purchases, the former of which he elected to affirm and the latter of which he sought to set aside on the ground of fraud, evidence tending to prove fraudulent misrepresentations with respect to the first purchase was irrelevant and hence inadmissible in the suit involving his right to rescind the second transaction.

3. **CONTRACTS: Varying Written Contract: Parol Evidence.** Where a written contract of sale was plain and explicit on its face and contained no provision authorizing the vendee to rescind if dissatisfied at the end of thirty days, parol evidence that such option was an agreed provision of the sale was inadmissible, as tending to vary a written contract.

4. **FRAUD AND DECEIT: Breach of Promise: Sales: Rescission.** The cancellation of a contract of sale on the ground of fraud may not be had for a mere breach of a promise made by the vendor.

5. ———: **Sales: Rescission: Sufficiency of Evidence.** In an action on a promissory note, defended on the theory that the note was given for the purchase price of corporate stock which defendant was induced to purchase from plaintiff through the latter's fraudulent misrepresentations, evidence *held* insufficient to warrant submission of the defense to the jury, and hence it is *held* a verdict should have been directed for plaintiff.

6. ———: **Misrepresentations.** The mere fact that a vendor sent persons to the vendee, telling him what a good thing the business purchased was, without more, is insufficient to warrant a finding of fraud.

7. ——————: ——————: Opinion. A statement by the vendor of corporate stock that the stock was very valuable was not sufficient to warrant a finding of fraud, since it amounted to no more than an expression of opinion.

8. ——————: ——————: Necessity of Reliance. Misrepresentations cannot be made the predicate of a finding of fraud if the person to whom they are made is not misled by them.

9. RESCISSION: Fraud: Necessity of Prompt Action. The right to disaffirm or rescind a contract on the ground of fraud must ,be exercised immediately on the discovery of the fraud, and the disaffirmance must be *in toto.* "Immediately" does not mean *instanter,* regardless of hindering conditions, but means a reasonable time, considering the conditions, not to deliberate on whether to rescind, but to do the things necessary in order to rescind.

10. ——————: ——————: ——————. In an action on a promissory note, defended on the thory that the note was given for the purchase price of corporate stock which defendant was induced to purchase from plaintiff .through the latter's fraudulent misrepresentations, where it was shown that defendant purchased the stock on May 16th and was immediately elected secretary of the corporation, that he discovered the alleged fraud on June 1st, and thereafter continued to act in connection with the corporation's business and sought to sell the stock to other parties, and did not seek to have the sale rescinded or offer to return the stock to plaintiff until July 29th, *held* that defendant did not attempt to rescind the contract on discovery of the fraud and hence his right to rescind was lost.

Appeal from St. Louis City Circuit Court.—*Hon. William M. Kinsey,* Judge.

REVERSED AND REMANDED (*with directions*).

*A. H. Breidenbach* and *H. A. Loevy* for appellant.

The decree is erroneous: (a) Representations by appellant even if they turned out to be false are still not fraudulent and therefore not actionable if believed by him (the vendor) to be true. Bank v. Hutton, 224 Mo. 70. (b) Even though the statements turned out to be false and were relied on, respondent (the vendee) must still have investigated to hold appellant (the

vendor) liable, having opportunity to do so.  Porter v. Railroad, 148 S. W. 164; Fund Co. v. Heskett, 125 Mo. App. 516; Jones v. Rush, 156 Mo. 364; Sanderson v. Veolcker, 51 Mo. App. 328; Sheffield v. Ice Co., 168 S. W. 229.  If the vendee cån investigate, he must. Fund Co. v. Heskett, 125 Mo. App. 516.  And as he did in this case, the vendor is exonerated.  Coal Co. v. Holdeman, 163 S. W. 842.  (c)  Even such exaggerations as that the business would make "a bushel of money a day" or that "the shares of stock would be worth $200 or $300 per share in two or three months" (here, that the business would pay 400%) are not fraudulent, and could not avoid purchase note. Black v. Epstein, 93 Mo. App. 459; Crandall v. Greeves, 168 S. W. 264; Muck v. Hayden, 173 Mo. App. 33.  (d) Because "puffing" is excusable.  Coal Co. v. Holderman, 163 S. W. 839.  (e)  And there is no liability for matters of opinion.  McKee v. Rudd, 222 Mo. 369.  (f) It is imperative that actual knowlege by Dr. Rigler (vendor) of falsity of his representations be shown by vendee.  It was not so shown.  Live Stock Remedy Co. v. White, 90 Mo. App. 503; Cement Co. v. Stewart, 103 Mo. App. 185; Felix v. Shirey, 60 Mo. App. 624; Reminer's Case, 217 Mo. 546.

*Thos. H. Sprinkle* for respondents.

(1)  Fraud is proven when it is shown that a false representation has been made knowingly or without belief in its truth or recklessly, without caring whether it is true or false.  Bank v. Hutton, 224 Mo. 70; Funding Co. v. Heskett, 125 Mo. App. 530; Hamlin v. Abel, 120 Mo. 188; Cottrell v. Krum, 100 Mo. 403; Cummings v. Parker, 250 Mo. 439; Muck v. Hayden, 173 Mo. App. 27; Cohn v. Reid et al., 18 Mo. App. 115; Dunn v. Waites, Admr., 63 Mo. 181.

NORTONI, J.—This is a suit on a promissory note, but the important question for consideration relates to the equitable defense set forth in the cross-bill. The answer and cross-bill charge the note was induced through fraudulent representations on the part of plaintiff, avers defendant rescinded the contract on discovery of the fraud, and prays the court for a decree of rescission touching the note and the contract of purchase for which it was given. The finding and judgment were for defendant and plaintiff prosecutes the appeal.

It appears that plaintiff, one Bloomer and Williamson were conducting a small business in St. Louis in partnership, manufacturing extracts. About February 25, 1911, this business was incorporated for $10,000 under the name of the Mound City Extract Company. The goods of the partnership were given over to the corporation in payment of the capital stock of $10,000 and such stock was issued to plaintiff, Bloomer and Williamson. About March 9, defendant Reid, desiring to go into business, purchased 300 shares of the stock, the face value of which were $10 each, for $1,000 from plaintiff, Dr. R. I. Rigler. At the time of this purchase, March 9, it is said plaintiff made certain false representations to defendant with respect to the value of the stock, etc. Among other things, it is said, Dr. Rigler told plaintiff he had invested $3,500 in the business and that it made a profit of four hundred per cent; however, there is no statement that it made a net profit of that amount. There is evidence tending to prove that some of the receptacles for extracts were not full, as they seemed to be, and that, in fact, the inventory was "stuffed." There is some evidence, too, that all of the liabilities of the company were not truly revealed to defendant—the discrepancy being some five or six hundred dollars thereabout. But, after all, the statement of assets and liabilities that defendant details shows total assets of $11,488.05 owned by

this $10,000 corporation and it appears plaintiff purchased $3000 worth of stock at par value therein from plaintiff for $1000, or at thirty-three and one-third cents on the dollar.

On March 31, defendant was elected secretary of the company and it appears that he continued in and about its office and plant all of the time and took an active part in managing the affairs of the business. Plaintiff, Dr. Rigler, was a practicing physician, and it is said he was present at the place of business only occasionally. Matters moved along with defendant present in the place of business and Bloomer traveling "on the road" until about the 16th of May, when one Herzog desired to purchase defendant's stock and the controlling interest in the business. On May 16, defendant made a new purchase of stock from plaintiff, Dr. Rigler, with a view, he says, of selling his entire interest to Herzog. By this second purchase, effected on May 16, 1911, defendant procured from plaintiff 460 additional shares of the stock in the company for the agreed price of $1800, to be paid as follows: $50 cash and $1750 by a note, dated May 16, 1911, and due in thirty days. This transaction was evidenced by a written contract of even date therewith, executed by both parties, and as part of the consideration defendant agreed to pay a note held by the Cass Avenue Bank for $203 and another note to the Merrill Drug Company for $80. Defendant insists, too, that it was agreed that if he became dissatisfied within thirty days he could surrender the stock to plaintiff, Dr. Rigler, take up his note, and receive the $50 paid, which was to be returned, and be released from the bargain, but there is no mention of this feature of the transaction in the written contract referred to.

About June 1, defendant had occasion to go through the books of the company and discovered, as he says, that he had been deceived on purchasing his stock on the 9th of March theretofore, in that the liabilities

of the company were several hundred dollars greater than he had understood and the amount of goods on hand was not as great as had been represented to him at the time. Also that plaintiff had not invested $3500 therein. Thereafter he sought to rescind by tendering the stock purchased on May 16 to plaintiff and demanding the return of his note and the $50 paid on the purchase of stock. Plaintiff declined to accede to the proffered rescission and said they would straighten the matter out some way, but nothing was done. Several months thereafter plaintiff instituted suit against defendant on the note of date May 16, given in consideration of the second purchase of stock, and defendant sets forth in his cross-bill that the note was induced by fraud; that upon the discovery of the fraud he rescinded the contract; and prays the court for a decree of rescission canceling the note and a judgment awarding him a recovery of the $50 from plaintiff.

There is much evidence in the record concerning representations made by plaintiff to defendant, pertaining to the first purchase of stock on March 9, 1911, but obviously this is foreign to the issue here in judgment, for the present suit deals alone with the note given May 16, 1911, and the cross-bill seeking a rescission for fraud in the inception of that transaction. Defendant in nowise seeks to rescind the contract by which he purchased the stock in the company of plaintiff on March 9, but, on the contrary, affirms that transaction. A person defrauded into making a contract has but an election and an election once determined is determined forever. An election to abide by the contract will prevent its rescission. Defendant clearly affirms the transaction of March 9, and his cross-bill seeks equitable relief only with respect to the transaction of May 16. The fraud, if any, antedating and concurring with the purchase of March 9, appears to be condoned and ratified by defendant. But though such be true, he details in evidence alleged fraudulent representations with re-

spect to the transaction of March 9 as if they are pertinent to be considered on his cross-bill for rescission of the contract entered into May 16 thereafter. Obviously this evidence is beside the case, for the contract in judgment is to be determined with reference to the facts and circumstances under which it was made. Concerning this matter, we find no substantial evidence in the record tending to prove fraudulent representations sufficient to mislead defendant and authorize the cancellation of the contract entered into on May 16. However, on reviewing plaintiff's evidence, it appears his real ground of complaint on which he seeks a rescission of the contract of May 16 in judgment here is that plaintiff agreed to take back the stock and surrender the note in suit if defendant were dissatisfied at the end of thirty days. But this may not be considered, for the whole transaction was reduced to writing at the time and no such provision appears therein. Obviously this is but an attempt to vary by parol the terms of a writen contract plain and explicit on its face. The evidence concerning this matter is to be rejected entirely as of no avail here.

We come now to consider the question of the alleged fraud and false representations, or, in other words, the fraud and deceit practiced by plaintiff on defendant and relied upon as the inducing cause of the contract of May 16 by which defendant purchased the 460 shares of stock and executed the note for same. The substance of defendant's case touching this matter is revealed in the following portion of the record—that is, an extended excerpt from his testimony, which we copy:

"Q. It was May 16 that you bought the second block of stock? A. Yes, sir. Q. Now, from March 9th to May 16th, what, if anything, did Dr. Rigler have to do with the conduct of the company? Did he take any active part in the management of the office? Did he come to the office to do anything? A. Yes, he was

down there quite often; but he had nothing actually to do. He is a practicing physician. He would drop in there every day or two; he would call up a couple of times a day, probably. Q. When you bought this second block of stock and gave this note, what induced you to do it? What did you rely upon? A. He came down there; he had been sending people down there about the stock, looking at the stock and looking at the place, and he didn't like the idea of it getting out only just with us few in; he told me it would be a good thing for me to buy. Q. Is that the reason you bought it? A. On his recommendation. I believed in him; I believed that what he said was right; I thought that he—. Q. What do you mean by 'what he said was right?' A. Well, he had always done what he told me he would do, in the best way; his business dealings had been favorable previous to this time. Q. Did you rely on his statement that he would take this stock back and return your $50 in 30 days, if you were not satisfied? A. I did. Q. Then you didn't rely on the statement made in March as to the condition of the company? A. Yes; I put that along with what he told me; I thought it must be correct. My investments previous to this time were under the same conditions, and when I asked for the principal, he has returned it to me. Q. Between the 9th of March, when you were put into the office to learn the business and after you bought the first block of stock, and the 16th of May, when you bought the second block of stock, did you discover anything in or about the business or the books of the company that led you to suppose that the statement made on March 9th was not true? A. Only in these checks that came in and the commissions and the few bills that were there. I took it up with them, and they said it would be adjusted later; the doctor said he would fix it up with me. Q. I thought you told me awhile ago that he told you that those checks were issued for money that was due

him personally. A. I kicked on those being paid. Q. What was it he said he would do, when you kicked on that being paid? A. He suggested several times that he would sell some of his stock and put the money into the company. Q. How much? A. He suggested different shares; suggested it different times. Q. Put it into the company—what for? To replace the amount of these checks? A. Yes, sir. Q. Reimburse the company for what it had expended? A. That they hadn't given me. Q. What I am trying to find out from you is what was the inducing cause for your buying this second block of stock; what was it you relied upon that induced you to buy the stock? A. Well, it was this—he kept sending representatives down there and telling me what a good thing this was, and made me believe that the stock was very valuable; his representatives were Mr. Parker, Mr. Sarles, his brother-in-law, and he had two other parties come down. He phoned me that they were coming, and he told me of several parties that he was going to send down to buy stock in the company; he said he was trying to sell his own stock, and he told me in advance that he was about to send somebody down to inquire as to the condition of the company. He told me to show the people around there; tell them what profit was being made, and what he had there, in a general way; most generally Bloomer taken care of them. He also had the arrangement with him as well as with me. Q. What did he tell you to say to these customers about the profits being made? A. About the same as what he had told me. Q. What did he tell you? A. About 400 per cent; he made the statement to me that the company was making 400 per cent before I bought my first stock; that conversation took place out at his office just about the day before I bought my stock. Q. Now repeat that conversation as it occurred, as far as you can. A. I asked him what per cent the company was making; he said about 400 per cent profit. Along

with this conversation he said that he had invested himself personally. Q. Was that gross profit, or net profit, did he say? A. No; he didn't say that. Q. Did the company make a gross profit of 400 per cent on its sales. A. Well, I hardly know whether they did or not; I don't think they did; in fact, I didn't go into the works enough to get to realize what he really did make. the way they bought the stuff in small dribs. I bought this second lot of stock on the 16th of May; after that I continued in the office of the company until June. Then there was arrangements made at the bank at that time for Bloomer to write the checks. I had been signing the checks before that time. The cashier told me about the change when I went to balance the bank book. We kept a bank account at the Cass Avenue Bank; it had been kept there while they were a partnership and after it was incorporated. I left the place about June 16th. Q. Why did you leave? A. Bloomer had not been on the road for several weeks previous to that date; he came in, and he wanted to take charge of the plant; there was nothing for me to do that I could reap any benefit from; I had to go out and do something for a living; he took charge of the place. Q. From the 9th of March until the 16th of June, were you paid anything for your services there? A. Yes; I had something like $200 altogether; probably a few dollars more than that. Q. Was there any arrangement among you as to how much you should draw? A. There was; $100 a month. Q. With whom was the arrangement made? A. Dr. Rigler and Mr. Bloomer. Q. Was any one else besides those two consulted about how much you should draw in the way of salary? A. No, sir; that arrangement was made practically between Dr. Rigler and I. The board of directors of the company consisted of Dr. Rigler, Williamson and Bloomer. I never was a member of the board. I was elected secretary about the 31st of March and did not resign as secretary. On June 16th I quit, because there was noth-

ing out there for me to do, owing to the fact that Bloomer had come in, and he wanted to take charge of the plant. I offered to give this stock back to Dr. Rigler and demanded my note and the $50 before June 16th at his office.''

Obviously the statements attributed to plaintiff in this testimony are wholly insufficient to charge him as for false representations so as to infect the transaction with fraud sufficient to authorize a rescission of the contract on that ground. The witness says that he relied principally on the promise of plaintiff to surrender his note and accept the stock in return if he became dissatisfied in thirty days and the evidence concerning this matter is incompetent because it contradicts and varies the written contract, which, separate and apart from the note, details the whole transaction. Furthermore, cancellation on the grounds of fraud may not be had for the mere breach of a promise. The mere fact that men were sent to defendant telling him what a good thing the business was, without more, is insufficient to predicate the charge of fraud and so, too, is the statement that the stock was very valuable. The latter is no more than an expression of opinion, and defendant, being secretary of the company, and in charge of the plant, was certainly not misled thereby. What defendant says on harking back to the representations made in March, to the effect that plaintiff stated the business yielded a profit of 400 per cent counts for nothing because he even disclaims knowledge as to whether that representation is true or false. The witness says that plaintiff did not say whether such a profit was net or gross, and then says, too, that he doesn't know whether that representation was true or false. It is entirely clear that the representations relied upon as fraudulent for a rescission of the contract are insufficient.

Moreover, it does not appear that defendant disaffirmed promptly and tendered the stock to plaintiff

in due time in order to afford him the right of rescission as for fraud and deceit. It is true defendant says he discovered the alleged fraud on the first of June and declared a rescission and tendered the return of his 460 shares of stock to plaintiff immediately before June 16. But it appears from other portions of the record that plaintiff continued in and about the business for some time thereafter and, indeed, sought to sell this stock to other parties. Letters in the record admittedly written by defendant reveal such to be true, and we find the fact to be that he first declared a rescission and tendered the stock to plaintiff about July 29 as stated by plaintiff. The facts and circumstances and letters in evidence overwhelmingly support this view. No one can doubt that the right to disaffirm or rescind a contract on the ground of fraud must be exercised promptly—that is, on the discovery of the fraud—and the disaffirmance must be *in toto*. [See Estes v. Reynolds, 75 Mo. 563; Taylor v. Short, 107 Mo. 384, 17 S. W. 970; Dougherty v. Stamps, 43 Mo. 243.] One who has been defrauded has an election either to affirm or rescind the contract, but he is bound to make that election at once on discovering the existence of the alleged fraud practiced upon him. He is not at liberty to hesitate and delay and wait for a future view of his own convenience or the market value of the property and to put forward an effort to sell the stocks before determining the question of the affirmance or the rescission of the contract. [See Hart v. Handlin, 43 Mo. 171.] Of course, "immediately," in such cases, does not mean *instanter*, regardless of hindering conditions. It may be said to mean a reasonable time considering the conditions and circumstances which prevail; however, such reasonable time is not allowed to speculate on whether to rescind but rather to do the things necessary in order to rescind. [Long v. International Vending Co., 158 Mo. App. 662, 139 S. W. 819.] At most, the right of the party is one of an election to rescind or

affirm the contract and unless he acts with reasonable promptitude thereon in declaring a rescission, he is to be treated as having waived to his right to rescind and elected to affirm the transaction. An election once determined is determined forever, for it cannot be recalled. [See Fry's Specific Performance (5 Ed.), sec. 739; Harms v. Wolf, 114 Mo. App. 387, 89 S. W. 1037.] Defendant should be regarded as having elected to affirm the contract because of his failure to promptly rescind.

For the reasons above pointed out, the judgment should be reversed and the cause remanded with directions to the trial court to enter judgment for plaintiff on the note and dismiss defendant's cross-bill. It is so ordered. *Reynolds, P. J.,* and *Allen, J.,* concur.